The next case on the calendar is United States v. Mladen. Mr. Mladen pleaded guilty to the very poor choices of leaving an anonymous note and making an anonymous phone call to a bankruptcy judge, saying to back off in the case, in essence, because it was an unreasonable, actually beyond maximum five-year sentence, and extremely poor physical and mental health at the Devens Medical Facility in Massachusetts. This case was probably heading toward, even in a pessimistic standpoint from Mr. Mladen's perspective, this case was probably heading to a sentence maybe within 18 to 24 months, which was the government's range that they advocated, when, of course, this whole case was turned upside down, I would say, by the submission to the court of a confidential informant's conversation. A transcript of such that was taken in prison. We believe that this — that the consideration of this tape itself was inappropriate, and it led to an unreasonable sentence. I'd actually like to start off, if I might, with the — even though it's a plain error argument, I recognize that — with the Messiah issue that I've raised as a matter of plain error. It's — Can you tell us exactly what the chronology was here, in terms of when the plea agreement was reached, when the government was informed by the fellow prisoner that he had some information, and when the tape was created? Okay. So I'll do my best. The offense in question occurred in July, the accused offense in July of 2017. I believe it was sometime in October of that month that the informant wrote to the marshal's office, and — Was that before or after a plea agreement was entered? I believe that was after the plea agreement was entered. He was arrested. I mean, he was in jail. He had been in — yeah, his bail applications were all denied. He'd been in jail since July. And then I believe the recording was made in November, even though they had been — the record reflects that they had been talking to each other, they knew each other in prison for a couple months at least. But one recording, about two hours long, you've got it in your confidential appendix, was made in November. Then I believe in December was when the government advised — first they advised the court ex parte, and then eventually the defendant, late December of that year, and then sentencing took place in February of 18. I hope I have that right, counsel. He executed his plea agreement on October 13th, correct? I mean, does that sound about right, the plea agreement? The plea agreement. And he pled guilty shortly after that? Yes. So that was in October of 2017. Okay. I may have the dates off a little bit. I'm sorry. And then the November 8th was the recording. Okay. But you also said that you believe that the informant reached out to the government sometime in October. Yes. I thought that's the chronology. The letters that he wrote to the marshal's office are not in the appendix. They were not given to the judge, but they are quoted in defense counsel's sentencing submission. And I've re-quoted them for you, particularly the parts where the informant says, I don't believe what this guy's saying. He must be crazy. I think that's an important point for our other argument, that there should have been a hearing. And if you don't believe this guy, why are we considering his statements? You've been talking — He had been indicted, and the formal trial procedures were proceeding, and the government inserted an informant who, you would argue, deliberately elicited remarks about the pending offense. Yes, absolutely. About the pending offense, I realize the government is saying that there were remarks about potential other offenses also taken in that conversation, but the fact that the government presented them and they were used in this case about these charges makes it a clear, plain Messiah violation. I don't think Texas v. Cobb, that they rely on heavily, has anything to do with this. Let's take it a step further. Suppose the guy, the informant, gets an admission from a defendant that he robbed a bank a year prior to the events here, and nobody knows about it. But he said it. He admits it. Is that out of the question as well, because it's used at the same sentencing? So the bank robbery is not — The question was — I thought the question was whether the lawyer — you needed a lawyer before he could be questioned in relation to this crime, but if he volunteered other crimes or mentioned other crimes, then Messiah didn't apply. Yeah. I believe this Court in Pineda — now, Pineda involved obstruction of justice after the charged offense, but the Court in Pineda seems to be saying that consistent with Messiah, other information can be brought in that bears on sentencing, which obviously could include other criminal activity. So I don't know that before or after the offense would make a difference. But the point is that if that informant is taking information that bears on the charge in the case, then I think it's a clear, clear Messiah violation under Pineda and under all those cases, Texas v. Cobb, Messiah. I don't think it's even close. That it's a — that it's a Messiah violation. I also strongly disagree with the government's argument that even if there is plain error here, it's not prejudicial because the judge at sentencing said, well, I think — well, let me step back for a second. As you know, this resulted in a — in a six-level increase under the guideline that — this was not in the plea agreement under the guideline about preparedness to carry out the threat, so to speak. And so to me, that's clear prejudice, that this — this six-level increase that was not even in the plea agreement was brought down on defendant. Now, the government says, well, the government — I'm sorry, the judge gave other reasons why that guideline may have applied, but those reasons have to do with concealment, with the fact that when he made the anonymous phone call, he didn't give his name when he bought the phone and things like that. They're not — they're not about the threat, and not even the government nor the Department of Probation even said that that was reason for that six-level increase to come into play. So really, you've got the six-level increase coming into play because of the Messiah violation. So that's — Well, but the — I mean, the district court did say, I think the phone call is significant, but I don't — I would make the same finding without the phone call. So are you — are you saying that he just didn't have adequate — setting aside the phone call, he didn't have an adequate basis for that finding? Yeah, absolutely not. I don't think anything he said goes beyond concealment. It doesn't have anything to do with preparation to carry out a threat, which only came into this case with the — with the recorded conversation, that — with the statements about that he had a gun supposedly that day when he — when he dropped off the note. So that's the prejudice. Let me point out, if we're — if there's a threat, if evidence suggests there's a threat in the first phone call, the fact that there is a second reiteration, you know, when he makes a second phone call using a burner cell phone and has the conversation while — I'm sorry, I'm misstating the record. The message is left in the mailbox, but then there's a phone call. And that's follow-on conduct that seems to intensify. And it's planned conduct that tends to — seems to intensify the initial communication, saying everything will turn out. What am I missing? I don't — it may be an intensification, but if it's not an intensification of manifest ability to carry out a threat, it's the same thing a second time over, in our view. And again, I would emphasize that in this plea agreement, the government didn't claim that those six levels should apply, and the Department of Probation didn't either. That all came in with the confidential informant tape. So I think it's — So the argument is that there's just not enough in the record. And the district court may have said he wasn't — he didn't need to rely on the tape. But, in fact, he did in order to reach the six levels. Yes. I mean, beyond — I see I'm out of time. But if I can say a little bit more, and Chuck, cut me off when you need to. But beyond the Messiah issue, we're saying that there should have been a hearing, that this man should have been required to take the stand because of his comments that he didn't believe what this guy is saying. I don't know how you can take these words off of a piece of paper and draw such dramatic meaning to him, with a man in such poor health, and give him a maximum sentence with — and, of course, we're arguing that it goes too far. The supervisor release goes beyond the maximum. I think you've got to have a hearing. And for that reason and his motivations and so forth, it's in the briefs. So I'll sit down now. Good morning. May it please the Court. My name is Mark Silverman. I represent the United States in this appeal. In July 2017, as Mr. Mulladin's bankruptcy proceeding was headed towards what he perceived to be an unfavorable resolution, he made two threats against the judge presiding over that bankruptcy litigation. First, around the Fourth of July holiday, he went to the judge's home address and left a note in her mailbox telling her to back off, that she was overstepping authority, and he was just warning for now. About five, six days later, on July 10th, he made a call to the judge's home phone number, which was relayed to her personal cell phone. He refused to identify himself but noted that he'd been to the judge's house the previous week and left a message for her and told her to extend a deadline in the bankruptcy case and then maybe everything will be okay. Based on that threatening conduct and then Mr. Mulladin's false statements to the marshals investigating that threatening conduct, Mr. Mulladin pleaded guilty to a 1001 charge and Judge Meyer sentenced him to the maximum term of imprisonment of five years. There was no error in that sentencing and no error in relying on the covert recording made on November 8th, 2017. To answer Judge Kearse's question about the chronology at play here, it was on October 12th that the Marshals Service received a letter from the informant about Mr. Mulladin's behavior in prison. On October 13th, the defendant pleaded guilty. So that was the next day. It was November 8th that the covert record. The date of the plea agreement? The plea agreement was entered and Mr. Mulladin pleaded guilty on October 13th. Both happened that day? Yes, Your Honor. And the plea agreement, in the plea agreement, he agreed to plead guilty to the 1001. Yes, Your Honor. And the government agreed to dismiss the charge with regard to the threat? Yes. The government agreed to dismiss count one of the indictment, but the government reserved its right to make the argument that the threat guideline should apply at sentencing. And that's what happened in the case. The government made that argument. It was November 8th that the covert recording was made, so that was a little less than a month after the change of plea, and sentencing proceeded in February of the next year, so about three months after the covert recording had been made. Could you address the Blockburger argument here? Because I'm troubled by the idea that when formal charges are pending, that the government could insert an undercover or an informant to investigate whether enhancement should apply, and I know that's not how you would characterize the facts here, but that seems to be the implication of your argument. Yes, Your Honor. So if I could back up for a moment and just explain the context in which the decision was made to introduce the informant. And I think this is reflected in the record. Mr. Mulladin was asking this informant to find someone on the outside who could threaten or assault the judge again to get her to back off. And so when the decision was made to make a covert recording, it was with an eye towards new conduct, completely new conduct, a la Pineda, this Court's decision that counsel referenced earlier. And so to be clear, that is what happened for much of the covert recording. In particular, information was elicited about Mr. Mulladin's plot to abduct and extort other litigants and lawyers in his bankruptcy case, about his plot to fabricate evidence to be used in a lawsuit against the bankruptcy judge, and about his plans to assault or kill the judge in the future. So all three of those offenses would be future conduct. All of them the government submits are Blockberger distinct offenses from Count 1 and Count 2 as charged in this indictment. Now, the government wrote in its brief there was also talk between Mr. Mulladin and the informant about past criminal conduct. And in particular, I'm thinking about the incident involving the gun and then possible obstruction for concealing the gun. It is the government's view that if Mr. Mulladin in fact brought the gun with him to the judge's house, either on the occasion when he dropped off the note or on some other occasion, or if he was simply sitting in his car thinking about going to the judge's house armed with a firearm, that those would be, all of that would reflect a different and distinct offense under Blockberger. In particular, I'm thinking about Section 115a1a, assaulting or murdering a Federal official or attempting to commit those crimes, which require different elements. Each of them has a distinct element from Section 115a1b. Kagan. Correct me if I'm misunderstanding, but if he had not entered a plea agreement and he'd gone to trial on the original charges, you wouldn't have sought to introduce the evidence about the gun at that trial, correct? I don't know that I can answer that question. I think there's a possibility there would have been a superseding indictment and things may have changed in that scenario. I think that this does present some thorny questions, and I think you're hitting them, Your Honor, with your question in particular about the six-level enhancements for evidence of intent to carry out a threat. But I don't know that this Court needs to grapple with those thornier questions because this is a plain error standard of review. And the third prong requires Mr. Mulotin to show that any Sixth Amendment violation had a substantial – had an effect on his substantial rights. He can't do that here because Judge Meyer could not have been more clear, thinking about A189 to A190, that Judge Meyer would have applied the six-level enhancement irrespective of the covert recording. I have no doubt, based on the facts here – this is a quote from Judge Meyer – that Mr. Mulotin's conduct, evidence, and intent to carry out the threat, that this was very far from some kind of a misguided or empty gesture. I rely on numerous facts here apart from the recording. And then he goes on to rely – essentially to recite in a more concise version the stipulation of offense conduct and relevant conduct incorporated in Mr. Mulotin's plea agreement. So the fact that Mr. Mulotin made two anonymous calls to the judge's husband's place of business, the fact that he then acquired a burner phone using cash and a false name, that he then went to the judge's house, that he then made that phone call, which, Judge Livingston points out, does intensify the threat. It does show that he's taking these steps. Judge Meyer concluded after going through this conduct, On the basis of just this, I do think that this carefully planned and extended conduct to me evidences an intent to carry out the threat. It wasn't just an impulsive one-day kind of conduct. He goes on, The prior conduct I just described would be sufficient in and of itself. And that's – that's – first of all, that would be reviewed for clear error. But there's no error at all in that conclusion. I know that my adversary talks about this all had to do with concealment. But in looking at Application Note 1 to Section 2A6.1, the Sentencing Commission itself says that in determining whether the subsection B1, that's the sixth-level enhancement we're discussing, applies, the Court shall consider both conduct that occurred prior to the offense and conduct that occurred during the offense. So the guidelines itself point us to exactly the information that Judge Meyer relied on in saying, I would have implied – I would have applied this sixth-level enhancement. I would have considered it independent, entirely independent of the covert recording. And so in the government's view, and before I conclude, Judge Meyer made that type of finding at every step along the way of sentencing. He says, I would have gone to the threat guidelines as an upward departure, an upward variance. I'm thinking there about A147 and A278. He says, I would have found a true threat based only on what's in the stipulation of offense, conduct, and relevant conduct. That's A167 and A168. I would have applied the sixth-level enhancement, A189 to A190. And he says, I would have gone up to the maximum sentence in light of the concerns  That's at A278 to A279. Could you also address the argument that in the context of this sentence saying it was an abuse of discretion not to call the informant, which had been requested? Absolutely. So the case law is quite clear that the sentencing procedures to be used fall within the discretion of the district court. And here, Judge Meyer heard at length, not only from Mr. Mulotin's counsel, but also from Mr. Mulotin himself, about the concerns they had about being baited or set up into saying these things. But the reality is that Judge Meyer had all of that. He knew and he called it the baggage of the informant. He knew all of that. He knew what motives the informant had, what consideration he could possibly be looking for. But he didn't know the content of conversations that may have taken place between the informant and the defendant prior to the taping. Right. And Mr. Mulotin was able to bring that out himself. He didn't have to take the stand. He didn't have to subject himself to cross-examination. Judge Meyer heard him out at the sentencing proceeding on his thoughts regarding those prior untaped conversations with the informant. The defense counsel was able to argue at length about those issues. And in the end, the judge said, you said what you said on this tape, and it's — this is from A191. The statements Mr. Mulotin made were of a piece, really, with the efforts that he took to quite carefully plan what it was he was doing and to escalate this encounter. So Judge Meyer decided he didn't need to hear from the informant. He knew about the baggage that the informant carried. And he heard at length from defendant and defense counsel about the setup, about those prior conversations that Judge Livingston alluded to earlier. So the government submits that there was no abuse of discretion at all in Judge Livingston's case. And Judge Meyer said, I don't think he could have been more clear in saying he would have reached this same sentence via the same route independent of the covert recording. I see that my time is up. I respectfully request that the Court affirm the judgment entered by the district court. Thank you. Mr. Culp. Thank you. Just very briefly on the chronology issue, just to be clear. At the time that the plea was entered, he — the defense had no idea that he was being recorded or anything like that. They didn't — were not notified about that. He had not been recorded at the time the plea was entered. Is that correct? I don't know. If he was, then there's been a discovery violation. He wasn't recorded until November. This recording was on November 8th. And he'd been guilty on October 13th. Right. Right. That's what I'm saying. There'd be a discovery violation if there's any other recordings, because we were only given one. On the last question, Your Honor, that you asked, the — I made this point before, but yes, defense counsel, my predecessor, argued at length on that issue of whether there should have been a hearing. But the person we didn't hear from was the guy who was in the room with Mr. Mulotin, who had been with him for two months and who had an opportunity to witness his issues of addiction and depression and so forth, and who said in these letters to the marshal's office that this guy's crazy, he's nuts. Why wouldn't you want to hear from the guy who was listening? And why was he nuts? What made you think he was nuts? Were you baiting him? Those kinds of questions. So — and then on the — All that information was presented to the judge, not through the informant, but other ways. It was in his mental condition. It was — Right. I don't think there's any substitute for putting that guy on the stand and saying, so you said he was nuts. Was he nuts when he said this? Was he nuts when he said that? I've also pointed out in my brief that there are things that are provably false. When he describes his plea in that recorded conversation, he talks about a conversation he had with the district judge, where the judge says, why don't you go to trial and you can cross-examine the bankruptcy judge? It never happened. We have the transcript of the plea. That never happened. So Mr. Mulodin was saying things that were not true on this tape, and I think we needed to have a hearing to get to the bottom of it. And just real quickly on the — back to the Messiah issue, I feel like the government is saying that if there's something in this tape that's different than the charged offense, then it sort of whitewashes the whole recording and they can use it any way they see fit. That's not the way Messiah works. In Texas v. Cobb, the man had been charged with robbery, and then he was subject to a similar situation, and they found out additional evidence that was closely related, but it was about different charges. The Supreme Court never said, oh, you could have used that on the robbery case, too. They didn't say that. They haven't — and Maine v. Moulton makes the exact same point. Could the sentencing context be different? I mean, if there is evidence that comes up about obstruction or about threatening a witness or about attempting to flee, there are lots of things that can happen after a plea is entered or after formal charges are brought that it seems difficult to say that the sentencing judge is supposed to not know of them. It may be different in some ways, and this Court in Panetta basically said that the judge is entitled to hear about this additional criminal activity. But if you're going to put in before that judge additional evidence on the charges in the case, to me that's an outright Messiah violation. The government's not saying that Messiah doesn't apply to sentencing. If you don't apply it to sentencing in this case, then you're changing the rule. And I think that's inappropriate. I think that's inappropriate. Sotomayor in which case do you rely on for the fact that it applies in sentencing? Panetta. Panetta says that the government doesn't disagree. And Estelle as well. Panetta is relying in turn on this. Because initially, of course, Messiah dealt with another indictment or a different crime that might be prosecuted and not necessarily sentenced. So you think the government is just sent this informant in to try and get more stuff that they could use at sentencing? No. I don't think this is about the government's motivations. They may have had concerns about what they were being told that was being said in prison cell. But if you're going to go in and you're going to take statements, you can't use them in the case in which he's charged. He has a right to counsel in that case. So you can't do that or else Messiah is a nullity. That's my position. Thank you very much. Thank you both.